# NEW ORLEANS–BELIZE ROYAL MAIL AND CENTRAL AMERICAN STEAMSHIP COMPANY, LIMITED, v. UNITED STATES.

## APPEAL FROM THE COURT OF CLAIMS.

No. 71. Argued November 11, 1915.—Decided November 29, 1915.

Under the charter party in this case, the United States did not so become the owner of the vessel *pro hac vice* as to be liable for injuries during the term of the charter and for demurrage thereafter during period of repair.

The charterer of a vessel does not become owner *pro hac vice* where the control, as in this case, remains with the general owner, even though the direction in which the vessel proceeds is determined by the charterer.

Authority to direct the course of a third person's servant does not prevent his remaining the servant of that third person.

The United States in this case, *held* not to be liable for damages to a vessel under charter due approximately to marine risk. *Morgan* v. *United States*, 14 Wall. 531, followed; *United States* v. *Shea*, 152 U. S. 178, distinguished.

The United States in this case, *held* not liable for damages sustained by a vessel under charter to it when rendering services in aid of another vessel belonging to the United States.

The fact that this case is a hard one does not make the United States legally responsible for the injuries sustained by a vessel during the period chartered. *United States* v. *Russell*, 13 Wall. 623, distinguished.

THE facts, which involve the liability of the United States for injuries to, and demurrage on, a vessel under charter to the Government, are stated in the opinion.

*Mr. A. R. Serven* for appellant.

*Mr. Assistant Attorney General Thompson,* with whom

*Mr. William Heitz* was on the brief, for the United States.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a claim for injuries to the steamship Stillwater while under charter to the United States from May 16, 1898, to November 3, 1898, and for demurrage from November 2 to December 14, 1898, while the vessel was undergoing repairs. It was rejected by the Court of Claims on the authority of *Plant Investment Co.* v. *United States*, 45 C. Cls. 374.

The injuries were caused as follows: First, in June, 1898, there was a collision with another steamship in Tampa Bay, it does not appear by whose fault. Three weeks later the Stillwater was driven against the rocks while unloading horses in Daiquiri Bay, Cuba, during a gale, with other incidental damage. On July 27, in Gauanica Bay, Porto Rico, there was another collision with a steamer. On August 3, in obedience to orders against which the captain protested, the Stillwater assisted in lightering the United States auxiliary cruiser St. Paul, at Arroyo, Porto Rico, and while lying alongside the St. Paul in rough water, was damaged by the after gun sponson of the St. Paul being thrown down upon it. On August 4, in obedience to orders from the naval lieutenant in charge, against the protest of the captain, the Stillwater was made fast to the Massachusetts, then on the rocks at Ponce, Porto Rico, and attempted to pull it off. The weather was rough, and in consequence of rolling against the Massachusetts and otherwise the Stillwater was damaged and strained. On August 26, in obedience to orders and against the protest of the captain, the Stillwater was placed alongside the Obdam, in the harbor of Ponce, for the transfer of commissary stores from the latter to her. The ships both rolled and the Stillwater

thumped heavily, and was badly injured. On September 3, at Ponce, the Spanish steamship Vasco ran into the Stillwater in the night time doing some damage, and finally, about three weeks later, the Stillwater went aground on a sand bar and a hole afterwards was found in her bottom. The bill for the repairing of the Stillwater was rendered in a lump sum, showing only the cost as a whole.

By the charter party made on May 12, 1908, Art. I, the claimant "does hereby grant and let" and a Quartermaster of the Army "does hereby take" the vessel for the voyages specified, "and for such longer time as she may be required in the military service of the United States, not to extend beyond" June 30, 1898, unless the charter shall be renewed. II. "The said vessel shall on the 16th day of May, eighteen hundred and ninety-eight, be ready to load and receive on board at New Orleans, La., or elsewhere, whenever tendered alongside, by the Quartermaster, United States Army, or his agent, only such troops, persons, animals, and supplies or cargo as he shall order and direct, and as the said vessel can conveniently stow and carry," reserving room for the vessel's cables and materials, for officers and crew, and for the necessary coal; and when so laden is to deliver the cargo at such port as the Quartermaster's Department may direct, "in good order and condition (the dangers of the seas, fire, and navigation, and the restraints of princes and rulers being always excepted)." IV. "The said vessel now is, and shall be kept and maintained while in the service of the United States, tight, stanch, strong, and well and sufficiently manned, victualed, tackled, appareled, and ballasted, and furnished in every respect fit for merchant or transport service, at the cost and charge of her owner. The time lost in consequence of any deficiency in these respects, and in making repairs to said vessel not attributable to the fault of the United States or

its agents, is not to be paid for by the United States."
V. All port charges and pilotage after leaving New Orleans
will be paid by the United States but not the wages of
any person employed by the claimant continuously on
the vessel as pilot. VI. "The war risk shall be borne by
the United States; the marine risk by the owner." VII.
The United States is to furnish fuel "until the said vessel
is returned to the said Company at New Orleans, La., in
the same order as when received, ordinary wear and tear,
damage by the elements, collision at sea and in port,
bursting of boilers and breakage of machinery excepted."
VIII. All water is to be furnished by the Government,
and all cargo loaded and unloaded at its expense. X. The
vessel is valued at $125,000, and if retained in the service
of the United States so long that the money paid under
the charter (less the cost of running and keeping in repair
and a net profit of 33 per cent. on the appraised value),
is equal to the appraised value, the vessel is to become the
property of the United States without further payment
except what then may be due for services under the
charter. XI. The United States also, during the charter,
may purchase the vessel at its appraised value, with a
similar clause for deductions. In XIII and XIV there
are provisions for renewal and against a transfer of the
contract or any interest therein by the claimant. These,
we believe, are all the portions of the charter party ma-
terial to the present case.

The main contest is upon the question whether by
this contract the United States became owner *pro hac
vice,* as affecting the extent of the liability assumed. The
claimant relies upon the words 'grant and let' on the
one side and 'take' on the other, the fixing of the price
at which the United States may purchase the vessel,
the reference to the vessel being 'returned,' the contem-
plation that the need of repairs may be attributable to
the fault of the United States, the control of the United

States over· the destination of the ship, and some details, as showing that the United States was in the place of the owner for the time. But we cannot accept this conclusion. The general owner furnished the crew and a master who at least regarded himself as representing its .interests since he protested against commands that he received. It agreed to deliver the cargo in good condition, dangers of the sea &c. excepted. It assumed the marine risk. We deem it plain that the control and navigation of the vessel remained with the general owner, although the directions in which it should proceed were determined by the United States. Authority to direct the course of a third person's servant does not prevent his remaining the servant of the third person. *Standard Oil Co.* v. *Anderson*, 212. U. S. 215. *Little* v. *Hackett*, 116 U. S. 366. *Reybold* v. *United States*, 15 Wall. 202. We conclude that the possession followed the navigation and control. The case resembles *Morgan* v. *United States*, 14 Wall. 531, not *United States* v. *Shea*, 152 U. S. 178, as in the latter it was found that the vessel was under the exclusive management and control of the Quartermaster's Department. See further *Hooe* v. *Groverman*, 1 Cranch, 214, 237. *Reed* v. *United States*, 11 Wall. 591.

The claimant contends, however, that if the ship was not demised, the United States is liable under articles IV and VII for not returning the ship in the same order as when received, and for demurrage due to repairs attributable, as it is contended these were, to the fault of the United States. The damage, however, for the most part was due proximately to marine risks, which the claimant assumed. *Morgan* v. *United States*, 14 Wall. 531. The demurrage accrued after November 2, the date on which it is found that the charter was ended. How much of it was due to damage from marine risks does not appear. The service in aid of the Massachusetts and others outside the contract, if any, imposed no liability upon the

United States.  *United States* v. *Kimbal*, 13 Wall. 636. *Reybold* v. *United States*, 15 Wall. 202.  *Schillinger* v. *United States*, 155 U. S. 163.  *Harley* v. *United States*, 198 U. S. 229, 234.  *Peabody* v. *United States*, 231 U. S. 530, 539.  We see no ground except the impression that this is a hard case to apply the principle of *United States* v. *Russell*, 13 Wall. 623.

*Judgment affirmed.*

MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of this case.