HANSEN v. E. I. DU PONT DE NEMOURS & CO., Inc.

Circuit Court of Appeals, Second Circuit. April 8, 1929.

Disposition Confirmed Without Opinion May 31, 1929.

No. 229.

See, also, 18 F.(2d) 782.

Bond, Schoeneck & King, of Syracuse, N. Y. (William H. Button, of New York City, and Clarence R. King, of Syracuse, N. Y., of counsel), for appellant.

Hancock, Dorr, Spriggs & Shove, of Syracuse, N. Y. (Henry S. Fraser, of Syracuse, N. Y., Bigham, Englar & Jones, of New York City, and Edward L. O'Donnell, of Utica, N. Y., of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). ▮ We have no doubt that the boats were not delivered upon a demise, but upon a charter to carry the powder to Buffalo. It may indeed be true that the barges were demised when originally deliv-

ered with only one bargee in charge, and that this continued until the written contract was made, or perhaps thereafter until. the tug took them in tow and began the voyage. As to that, however, we say nothing, for before the fire the rights of the parties had already been defined by the written contract, which we see no reason to interpret as changing the normal relations between owner and shipper. This is especially true as to the tug, whose hire was to be "for use of towing" the barges. Standing alone, we cannot see how there could so far be any doubt. To be sure the payments are spoken of as "rentals," just as the barges themselves were "rented," but equivalent words have often been held consistent with a charter. Morgan v. U. S., 14 Wall. 531, 20 L. Ed. 738; New Orleans-Belize Co. v. U. S., 239 U. S. 202, 36 S. Ct. 76, 60 L. Ed. 227. The libelant relies upon U. S. v. Shea, 152 U. S. 178, 14 S. Ct. 519, 38 L. Ed. 403, but the charter was there of an especial kind, not limited to the "use" of the boat (page 189 of 152 U. S. [14 S. Ct. 522]), and allowing the government to substitute other vessels at the owner's expense. It was for this reason held to be a "contract for vessels," from which the implication was drawn that the charterer was to have "management and control."

Concededly this is the determining circumstance, though it is not always easy to determine who really has that management and control. We start, however, with the general presumption that the owner does not mean to put his vessels into the possession of the charterer (Reed v. U. S., 11 Wall. 591, 601, 20 L. Ed. 220, Auten v. Bennett, 183 N. Y. 496, 501, 76 N. E. 609, 5 Ann. Cas. 620), and that the presence of his own crew on board is "very strong presumptive evidence" that he does not, which only "very cogent circumstances" will overthrow (per Story, J., in Certain Logs of Mahogany, Fed. Cas. No. 2559). Moreover, the charter was for a voyage; the boats were not delivered for the charterer's general purposes, as in U. S. v. Shea, supra, and The Charlotte (D. C.) 285 F. 84, affirmed 299 F. 595 (C. C. A. 2).

Viewed generally, there was therefore no reason, at least as to the tug, for saying that the ordinary relations imposed in such cases did not obtain here. Moreover, some of the language chosen by the libelant strongly corroborates this conclusion. There could have been no occasion for throwing upon the charterer all risks of the cargo if the instrument had been a demise. It is true that even then the seaworthiness of the vessels would still have been warranted, and that might

give a possible justification for the clause, but it went further than this. The charterer assumed all risks without limitation, a provision certainly out of place in a demise. More might indeed be said for the libelant's position as respects the barges, and, as we have already said, perhaps their original delivery was on a demise; but when the tug was added, and the contract became one to carry the cargo to Buffalo, the relations became what they would have been, had this been the original agreement. Thereafter the flotilla was a single means of transportation, by which the respondent's property was to be taken from one place to another.

■ Nor do we attach any significance to the fact that the respondent hired another barge and added it to the flotilla. That may have been under its "management and control" (Hastorf v. Long [C. C. A.] 239 F. 852, and Dailey v. Carroll [C. C. A.] 248 F. 466), but the mere fact that it added a third barge to the tow did not change its relation to the other vessels. The rule that barges, when let with bargees, are demised, is confined to those which have no motive power of their own.

■ Any liability must therefore depend upon the conduct of Kavanaugh while in charge of the cargo. To show this the libelant relies upon the original stowage of the powder, Kavanaugh's inattention to the actions of the crew, and his positive assent to nailing the engine upon a case of powder. The evidence was in great dispute as to the first, but we cannot properly substitute our own conclusions for those of the learned trial judge, who saw nearly all the witnesses. We must assume that the cases were broken, that the cordite protruded, and that it lay about the deck. This was certainly a hazardous condition to create, for it subjected the flotilla to peril from any chance spark. However, it was a condition equally apparent to the crew as to Kavanaugh, and charged them with notice of the danger from the use of the engine, especially when primed as they primed it. The judge found that they were advised of the dangerous nature of the cargo and that they ignored it.

He also found that they did so because Kavanaugh had expressly consented to their nailing the engine upon the top of the case. Perkins, a bargee, so testified, and the judge says that Greene, the tug's engineer, did so also. But his testimony does not go quite so far. He swore that on the night before Kavanaugh had seen them operating the engine within 18 inches of the nearest case and had said it was safe; Kavanaugh swore that at this time the exhaust was directed out-

board. We think it incredible that Kavanaugh should have consented to so mad an antic as nailing the engine on top of a case and priming it with gasoline. He was well acquainted with the inflammability of the powder, and while we are willing to believe that he was unduly slack in keeping an eye upon what went on, this presupposes, upon the word of the bargee alone, a deliberate sanction of what even the slightest attention would have recognized as to the last degree perilous. On the other hand, it is undisputed that he was on the tug at the time, and there was ample evidence that he could have heard the engine, and concluded that they were using it upon the deck of the barge.

Thus the case is one where the charterer has been negligent in stowing the cargo, and the owner's servants in what they did thereafter, and where their negligence was not excused by any assurance from the charterer that they might go on. At best, it is therefore one for divided damages; but before going even so far as that the libelant must establish the respondent's liability. A charterer is not ordinarily liable for stowage, this being the duty of the ship; but in this case it had undertaken that duty and had left the barge in an unsafe condition. That was an affirmative act, for the consequences of which the respondent would be liable. However, it was not responsible for all possible results of Kavanaugh's acts, though it is a vexed question whether the liability is limited to such as he could have foreseen, or to such as were their "natural" consequences. Smith v. Railroad, L. R. 6 C. P. 14, 21; Hill v. Winsor, 118 Mass. 251; Ehrgott v. Mayor, 96 N. Y. 264, 281, 48 Am. Rep. 622. We doubt, indeed, that the difference is in the end more than one of statement. However that may be, unless a later negligent act is at the outset to be anticipated (Atchison, etc., R. R. v. Calhoun, 213 U. S. 1, 29 S. Ct. 321, 53 L. Ed. 671), it ordinarily "breaks the causal chain," and the first tort-feasor is not liable (Cleary v. Port Reading R. R., 29 F.(2d) 495 (C. C. A. 2). Clearly Kavanaugh could not have anticipated that the libelant's servants would engage in such extravagant negligence.

A question might indeed arise, if he had seen what they were doing and had failed to intervene. We do not decide what duties his original act of negligence might in that case have imposed upon him; that which he originally could not have anticipated would then in fact have appeared about to take place. We may assume arguendo that he

would have been obliged at least to give warning. But the judge did not find, and the evidence does not compel us to say, that he saw how the men were using the engine. Its mere noise did not advise him that they were handling it otherwise than as they had done before; some uses were harmless. He could be charged, if at all, only after more explicit notice than was proved; the probabilities are that he would not have remained inert, had he seen the danger to which they were exposing his cargo. To us it seems that the libelant brought the damage altogether upon itself, and that the party more really aggrieved is the respondent.

Decree reversed; libel dismissed.