502

THE TERNE.

BERGEN LLOYD A/S v. MUNSON S. S. LINE.

No. 323.

Circuit Court of Appeals, Second Circuit.

April 17, 1933.

Irving L. Evans, of New York City (John Tilney Carpenter, of New York City, of counsel), for appellant.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt and Arnold W. Knauth, both of New York City, of counsel), for appellee.

Before MANTON, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The appellant chartered the steamship Terne of the appellee, her owner, under the terms of a government form time charter which contained a breakdown clause reading as follows:

"15. That in the event of the loss of time from deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra coal consumed in consequence thereof, and all extra expenses shall be deducted from the hire."

The owner provided the captain and crew. The captain was subject to the orders of the charterer "as regards employment or agency" and was to be furnished with "all requisite instructions and sailing directions." The owner was bound to maintain the class of the steamer and to keep her "in a thoroughly efficient state in hull, machinery and equipment for and during the service." This charter was not a demise. Munson S. S. Line v. Glasgow Navigation Co., Ltd. (C. C. A.) 235 P. 64; The Volund (C. C. A.) 181 F. 643.

In accordance with its right under the charter, the appellant subchartered the steamer for a voyage from Georgetown, P. E. I., to Havana and Tarafa, Cuba, with a cargo of potatoes. The steamer arrived at Georgetown to load the cargo January 9, 1929. She had to wait while three other steamers were loaded. On January 15th her captain telegraphed the appellant at New York that he considered it unsafe to remain at Georgetown because of ice conditions; that the weather the day before had been much below freezing, and, unless the appellant instructed otherwise, he would leave as soon as possible. Thereupon the appellant telegraphed its Georgetown agents advising them of the captain's wire and telling them to instruct the captain to remain if the agents considered it safe to do so. The agents then communicated with the captain and telegraphed the appellants in part as follows: "Have instructed Terne wait and load cargo. Do not consider danger ice for some days." After talking the matter over with the representative of the agents, the captain, influenced by a message he had received from the steamship Andres, which had shortly before sailed from Georgetown, showing that that ship had reached the sea without ice trouble, was satisfied that he could safely remain to load the cargo.

The cargo was fully loaded by 2:35 a. m. January 20th, and the Terne sailed at 7 o'clock that morning, intending to go through the Strait of Canso to sea. The weather was then clear, the wind southerly, and there was no ice worthy of mention. By 10 o'clock the same morning the ice had become so thick that the captain decided it was out of the question to attempt the Strait of Canso passage, and he changed his course to go north of Cape Breton. He proceeded on this course, keeping about ten miles off the coast of Cape Breton Island. The barometer was falling and about 2 p. m. it began to snow. The wind kept increasing and changing until by 9:20 p. m. it was blowing from the northwest with a force of 4 on the Norwegian scale. The drift ice and the storm forced the ship to turn back to try to get in the lee of Prince Edward Island. She was soon unable to make headway, and by daylight was fast in the drift ice three or four miles off the coast of Cape Breton Island. By a little after 11 that morning, January 21st, when she had drifted with the ice until she was about a mile off shore, the movement of the ice stopped, and she was held there until February 8th, when the Canadian government's ice breaker Stanley, which the captain of the Terne had requested to assist, was able to release her. She then followed the Stanley under her own power through the lane in the ice made by the ice breaker to open water, where she was taken in tow by the Stanley, with the assistance of the Terne's own engines, to North Sydney. When the Terne left Georgetown, she was to put into either North Sydney or Louisberg for bunker coals before proceeding on her voyage to Cuba.

At some time after she sailed from Georgetown, and before she was released from the ice by the Stanley, the Terne's rudder stock was so twisted that it would turn the rudder only from amidships to hard over to one side, and would steer the ship only one way. There was some testimony which might indicate that the rudder did not work properly before the ship was stuck fast in the ice, but not enough to prove that as a fact. The rough log for January 22d, reads in part: "The ice is heavy all around the ship and rafted several feet. Heavy strain on ship and rudder." And in the smooth log on the same date an entry to like effect was made.

On February 6th in the rough log was entered: "After midnight the pressing of the ice increased. The ice worked itself up in high piles on the ship's sides, specially from amidship and aft, on both sides of the ship the ice pressed itself half way up to the rail. Violent sounds were heard in the ship and the rudder was forced hard over to starboard from its amidship position, whereby the rudderstock got twisted 30 degrees. The buffersprings in steering line burst and the rudder plate considerably bent." In the smooth log under the same date is the entry: "From 10 P. M. and during the night, the ice is pressing heavily against the ship's side." And the first part of the entry for February 7th reads: "After midnight, the pressing of the ice increased against the ship, and at the same time, it piled up in big piles alongside of the ship. Violent blows, sounds, and cracks were coming from the ship's side, and the rudder which had been amidships was pressed over towards starboard, whereby the rudder stock was twisted about 30 degrees. The steering gear chain has become very much stretched and the spring on the port side has parted. By an examination at daylight, several plates at the ship's side at the water line were found indented. The rudder plate was twisted in several directions." From all the evidence we are led to believe that the damage to the rudder occurred as shown by the log entries. At 10 a. m. February 8th, the Terne began to move out in the lane in the ice made by the Stanley. The smooth log from noon to 4 p. m. that day states: "The rudder is acting very badly for the left." She reached North Sydney in tow of the Stanley and was moored alongside a dock at 3:15 a. m. February 9th. A survey of the rudder and steering gear was had that day and repairs begun which were finished by 2 p. m. February 14th. She had her bunkers aboard by noon that day.

There was delay in getting the Terne alongside the coaling dock due to the ice in the harbor, and the repairs at North Sydney did not keep the ship in that port longer than she would have had to remain there for bunkers and to await favorable ice conditions for leaving had she been in no need of repair. As soon as the ice permitted, after the coaling was completed, she proceeded on her voyage to Cuba. While at North Sydney, a survey of the cargo was had, but that neither delayed the coaling, the making of repairs to the ship, nor her departure.

The appellant refused to pay charter hire from January 21, 1929, at 5:15 a. m., when it was claimed the Terne became fast in the ice, to February 12th at 6 p. m., when it was claimed she began to bunker at North Sydney, and also deducted the cost of 36½ tons of coal claimed to have been consumed during this time. The libel as originally filed was brought to recover this charter hire and the deduction for coal. When the cause was called for trial, on February 17, 1932, the libelant was allowed to amend by including a cause of action for the expense of the Stanley and cost of repairs at North Sydney. The trial was then continued to April 25, 1932, to give the appellant an opportunity to meet the new cause of action, and resumed on the latter day. The parties had stipulated that the evidence taken in an action by the cargo owner "respecting the navigation and management of the S/S Terne on a voyage from Georgetown, Prince Edward Island, to Sydney, Cape Breton, and thence to St. John, N. B. beginning January 20, 1929, and relative to ice conditions on said voyage, the services of the ice-breaker steamer Stanley, and the call of the Terne at Sydney, Cape Breton, or relating to other facts or issues in this cause," might be used in this action subject to objection as to form and competency as though it had been taken herein. After the amendment, the appellant objected to the use of such testimony in so far as it related to the new cause of action, and it was received subject to being struck out if prejudice appeared because of amendment. Subsequently, the District Court held that no prejudice had been shown, and used the evidence in accordance with the stipulation.

So long as the Terne was able to combat whatever adverse weather conditions she encountered with all her ability unimpaired, she was not off hire under this breakdown clause. Barker v. Moore & McCormack Co. (C. C. A.) 40 F.(2d) 410. But when her rudder and rudder stock were injured by the ice, at least as early as February 7th, so that she could steer only one way, her injuries prevented the full working of the vessel, and by the terms of the charter party it was agreed that "the payment of hire shall cease for the time thereby lost." However, she was fast in the ice when she was injured, and was taken to North Sydney as soon as she could be released, and, so far as appears, as soon as she would have arrived there had she sustained no damage. It may be that after she followed the Stanley to open water she might have made North Sydney a little sooner had she been uninjured and not towed, but even that has not been made to appear.

It must be noticed, however, that the charter contained no ice clause. The detention in the ice up to the time the rudder stock

was damaged February 7th was not due to any accident, Barker v. Moore & McCormack Co., supra, but to adverse weather conditions which brought in the drift ice that held the ship. Yet the ship's previous ability was unimpaired. It was merely insufficient to overcome the forces of nature which held her fast. In this respect she was as though fog bound, and lost time because the full working of the ship was prevented because the weather made it too dangerous. In this instance the weather had brought in the ice which made working the ship useless, but the Terne was still as able a ship as she had been before.

■ When her rudder stock was twisted by ice pressure February 7th, and she was so injured that she had only about half the normal capacity of her rudder, her ability as a ship was impaired by an accident and by an average accident, Barker v. Moore & McCormack Co., supra, to bring her within the terms of the breakdown clause. In this connection another clause in the charter party which obligated the owners to "keep the steamer in a thoroughly efficient state in hull, machinery and equipment for and during the service" must be noticed. The Terne had to be repaired. She was repaired, and it is claimed was not in a thoroughly efficient state for the service of the charter until 2 o'clock in the afternoon of February 14th. There is no suggestion that her repairs were not completed as soon as it was possible to make them. Relying mainly upon The Yaye Maru (C. C. A.) 274 F. 195, the appellant's position now is that from February 7th until the afternoon of February 14th she was detained by an average accident to the ship. During a part of the same time she was also necessarily coaling at North Sydney, and, though the appellant had the use of her for that purpose, the parties agreed that she should be off hire in the event of loss of time from "detention by average accidents to ship, * * * or by any other cause preventing the full working of the vessel," and that regardless of the use, if any, to which the charterer might be able to put her during that time. So far as this relates to detention merely, it is plain that she was necessarily held there for repairs even though the need for bunkers kept her also. This it is claimed, was enough to put her off hire from the time of her injury, February 7th, to the time she was repaired, February 14th. However, as the agreement of the parties was for off hire for time lost by detention in accordance with the breakdown clause, the correct solution depends upon what time was lost that can be attributed to any of the causes there mentioned.

■ In the case just cited, the ship, when injured, was on no voyage, but was merely waiting in the harbor at Baltimore for cargo which could not be loaded because an embargo prevented that. She could, but for her injury, have been put to some other use by the charterer, for no embargo held her at Baltimore. But the Terne was on a voyage when injured; had her cargo aboard; could not have been used by the charterer for any other purpose; was actually used for that voyage exactly as she would have been, with the possible exception of the tow by the Stanley through the open water to North Sydney, which is not shown to have itself occasioned any loss of time, had she received no injuries at all; and a part of her service on that voyage was to coal at North Sydney or Louisberg. After she arrived at North Sydney she was in all respects efficient so far as coaling was concerned. Neither her injuries nor the required repairs hindered that in the least. The time taken to go to North Sydney and to coal there was not time lost, since the charterer used the ship during that period for the only use and to the full extent she could have been put to perform the service for which she was chartered. That time is like that while the ship was discharging cargo in Hogarth v. Miller, [1891] A. C. 48. As that ship was held while unloading not to be off hire on the ground that she was efficient "with reference to the particular employment demanded of her at the time," so here, because the Terne was used exactly as she otherwise would have been, she was not off hire, since no time was lost because of any injuries or their repair. It was lost because of the condition of the ice and not because of the condition of the ship. See Lake Steam Shipping Co. v. Bacon (D. C.) 137 F. 961, affirmed (C. C. A.) 145 F. 1022. She was fully repaired before the condition of the ice permitted her to leave North Sydney.

The interlocutory decree provided for the recovery by the libelant of the cost of repairs and the expenses of the Stanley. It already has been noticed that this charter was not a demise. The intent of the parties in this respect cannot be mistaken, for it is shown by the following clause:

"25. Nothing herein stated is to be construed as a demise of the Steamer to the Time Charterers. The Owners to remain responsible for the navigation of the steamer, insurance, crew and all other matters, same as when trading for their own account."

■ The captain managed the ship for the owner, and, though he was the agent of the

charterer for some purposes, he was not in respect to the navigation of the vessel. New Orleans-Belize S. S. Co. v. United States, 239 U. S. 202, 36 S. Ct. 76, 60 L. Ed. 227. No matter whether he decided to remain and load the cargo at Georgetown for one reason or another, the decision was his to make in the performance of his duty and the exercise of his power as the master. Hanson v. Haywood Bros. & Wakefield Co. (C. C. A.) 152 F. 401. What he decided as to that was not the decision of the charterer. Consequently, whether or not the stay at Georgetown or the departure from Georgetown at the time the vessel broke ground be thought to have had any causal connection with her being caught in the ice, for her consequent damage the charterer cannot be held responsible. Nor do the services of the Stanley have any different legal standing. It is true that the charterer attempted to have the ice breaker sent to the Terne's assistance, but was unable to have that done because the master's request for assistance was required and the Stanley would and did come only in response to his request. In making the request, he was not the agent of the charterer.

One further point is the claim that Georgetown, though a safe port at the time the charterer ordered the ship there, became an unsafe port while she was there. This is an offshoot of the contention that the charterer was responsible for keeping the Terne in Georgetown, but, as we have already concluded that such a position is untenable, it is enough to dispose of this claim to notice that Georgetown was admittedly a safe port when the Terne arrived without deciding whether or not it later became unsafe.

The libelant may recover the charter hire without deduction, but not the cost of the repairs to the Terne or the amount paid on account of the Stanley.

Decree modified.