22-1029
*American Cruise Lines v. United States of America, et al.*

# In the
# United States Court of Appeals
# for the Second Circuit

---

August Term 2023
Argued: January 12, 2024
Decided: March 15, 2024

---

No. 22-1029

---

AMERICAN CRUISE LINES,
*Petitioner*,

v.

UNITED STATES OF AMERICA, UNITED STATES MARITIME ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION, PETE BUTTIGIEG, IN HIS OFFICIAL CAPACITY AS SECRETARY OF TRANSPORTATION, LUCINDA LESSLEY, IN HER OFFICIAL CAPACITY AS THE ACTING MARITIME ADMINISTRATOR,
*Respondents*,

VIKING USA LLC, RIVER 1,
LLC,
*Intervenors*.

---

Petition for Review from the United States Maritime Administration

---

Before: CALABRESI and PÉREZ, *Circuit Judges*, and NARDACCI, *District Judge**

On petition for review of a final decision of the United States Maritime Administration pursuant to 28 U.S.C. § 2342(3)(A).

---

* Judge Anne M. Nardacci of the United States District Court for the Northern District of New York, sitting by designation.

The United States Maritime Administration ("MARAD") issued a final decision confirming the legality of an agreement between River 1, LLC and Viking USA LLC as a "time charter" subject to standing approval under 46 U.S.C. § 56101(a)(i). Petitioner American Cruise Lines challenges the decision, arguing that MARAD violated blackletter maritime law and analogous regulations for determining whether a charter agreement grants a foreign company impermissible control of an American vessel; and that MARAD failed to comply with the amended notice and comment provisions of the National Defense Authorization Act of 2021. We determine that American Cruise Lines has standing to bring this petition. However, we affirm MARAD's decision as reasonable and conclude that MARAD adequately complied with all applicable procedural requirements.

AFFIRMED.

JONATHAN BRIGHTBILL (Spencer W. Churchill, Constantine Papavizas, *on the brief*), Winston & Strawn, LLP, Washington, D.C., *for Petitioner.*

CASEN ROSS (Charles W. Scarborough, *on the brief*), Civil Division, United States Department of Justice, Washington, D.C., *for Respondents.*

SHAY DVORETZKY (Kyser Blakely, Parker Rider-Longmaid, and Hanaa Khan, *on the brief*), Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C., *for Intervenor Viking USA LLC.*

ARTHUR R. KRAATZ (Thomas Kent Morrison, *on the brief*), Phelps Dunbar LLP, New Orleans, LA., *for Intervenor River 1, LLC.*

MYRNA PÉREZ, *Circuit Judge*:

Viking River Cruises, participating in this litigation through its subsidiary Viking USA LLC ("Viking"), has long offered cruises on rivers around the world, particularly in Europe and Egypt. This case concerns whether Viking's recent expansion into the United States and the Mississippi River cruise market through a charter agreement with River 1, LLC ("River 1"), an American company and a subsidiary of Edison Chouest Offshore, was legal under federal maritime law. The

United States Maritime Administration ("MARAD") found that it was, and today, we affirm.

## BACKGROUND AND APPLICABLE LAW

A series of federal maritime statutes colloquially known as the "Jones Act" generally bars foreign-owned companies from engaging in "coastwise" commerce, meaning commerce taking place between different ports within the United States. *See*, *e.g.*, 46 U.S.C. § 55103 (barring foreign companies from transporting passengers between ports within the United States in most situations); *Id.* § 55102 (applying similar restrictions to commercial shipping activities); *Id*. § 55109 (applying similar restrictions to dredging activities); *Id*. § 55111 (applying similar restrictions to towing activities).

Two Jones Act provisions are at issue in this case. The first is the Passenger Vessel Services Act of 1886, which bars foreign-owned vessels from transporting passengers "between ports or places in the United States to which the coastwise laws apply." 46 U.S.C. § 55103. And the second is the Shipping Act of 1916, which requires American companies to seek approval from the Secretary of Transportation and MARAD for any transaction to "sell, lease, charter, deliver, or in any other manner transfer, to a person not a citizen of the United States, an

4

interest in or control of . . . a documented vessel owned by a citizen of the United States." 46 U.S.C. § 56101(a)(i).

In order to access the rapidly growing Mississippi River cruise market, Viking, a Swiss company, established a unique arrangement with River 1. Under the agreement, River 1 would construct a cruise ship which Viking would then charter for cruises on the Mississippi River. River 1 employees would manage the ship's maritime activities, while Viking employees would manage the onboard entertainment operation.

MARAD regulations provide for a standing blanket approval for most forms of charter agreements. *See* 46 C.F.R. § 221.13. Before commencing the building of the ship, River 1 and Viking sought confirmation from MARAD that their agreement constituted a "time charter," which would be protected from any MARAD enforcement action by 46 C.F.R. § 221.13's blanket approval. *See* 46 C.F.R. § 221.13(b)(2). After a notice and comment process that is discussed further *infra*, MARAD agreed with River 1 and Viking, and found in a March 18, 2022 final decision that the agreement constituted a permissible time charter under the blanket approval and would not result in an impermissible transfer of control to a non-citizen corporation.

Petitioner American Cruise Lines challenges that final decision, alleging that Viking and River 1's agreement should instead be construed as a "bareboat" charter.[1]  46 C.F.R. § 221.13's blanket approval does not cover bareboat charters. American Cruise Lines alleges that because the agreement is a bareboat charter, the agreement will result in an impermissible transfer of control over the vessel to a non-citizen corporation.

River 1 continued construction of the ship it planned to charter to Viking throughout the pendency of MARAD's decision-making process.  And several months after MARAD's March 2022 decision, in September 2022, the *Viking Mississippi* set sail.[2]  Viking now offers a variety of cruise itineraries on the Mississippi River.  American Cruise Lines alleges that Viking's presence in the Mississippi River market has cut into its market share.  Today, American Cruise Lines asks us to remedy this competitive injury by assessing the legality of MARAD's actions.

---

[1] A bareboat charter is sometimes also referred to as a "demise" charter.

[2] *Viking Mississippi Debuts on the Mississippi River*, Cruise Industry News (Sep. 3, 2022), https://perma.cc/ZW9R-N278.

## DISCUSSION

We conclude that American Cruise Lines has standing to pursue this petition. However, we affirm MARAD's decision and process in this matter.

### A. Standard of Review

Our review of agency actions under the Administrative Procedure Act is "narrow and deferential." *Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022) (internal citations omitted). We may only "set aside an agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* (*citing Alzokari v. Pompeo*, 973 F.3d 65, 70 (2d Cir. 2020) (internal quotation and citation omitted)). An agency's decision is arbitrary and capricious only if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (internal quotation marks omitted) (quoting *Alzokari*, 973 F.3d at 70).

**B. Standing**

As an initial matter, we determine that American Cruise Lines has standing to challenge MARAD's final decision. River 1 and Viking argue that because there is no guarantee that MARAD will pursue an enforcement action if their final decision is vacated, American Cruise Line's alleged injuries in the form of increased competition are not redressable.

"To satisfy the redressability element of Article III standing, a plaintiff must show that it is 'likely, as opposed to merely speculative, that the [alleged] injury will be redressed by a favorable decision.'" *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F. 4th 34, 47 (2d Cir. 2023) (en banc) (*quoting Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). However, a plaintiff "need not show that a favorable decision will relieve [their] *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). A remedy that "would serve to . . . eliminate any effects of" the alleged violation that produced the injury is sufficient. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105–06 (1998).

River 1 and Viking may well be correct that MARAD will not immediately bring an enforcement action against them if this Court vacates MARAD's decision. However, American Cruise Lines identifies at least two injuries that a favorable

8

outcome would more definitively redress. First, vacatur of MARAD's final decision would give American Cruise Lines a new opportunity to engage with a public notice and comment process. And second, vacatur would likely prevent River 1 and Viking from imminently expanding into other markets where it would compete against American Cruise Lines—namely, the Snake River in the Pacific Northwest. Because a favorable decision would likely alleviate these injuries, we conclude that American Cruise Lines has standing to challenge MARAD's decision.

## C. MARAD's Final Decision

On the specific facts of this record, we cannot say that MARAD's final decision was arbitrary and capricious. MARAD conducted a careful, fact-intensive analysis of the proposed agreement between River 1 and Viking and applied blackletter maritime law and analogous regulations to reach a reasonable conclusion: that the agreement constituted a time charter subject to the 46 C.F.R.

§ 221.13 standing blanket approval, and that the agreement would not result in an impermissible transfer of control to a foreign corporation.

### 1. Blackletter Maritime Law

MARAD primarily relied on blackletter maritime law to conclude that the agreement between River 1 and Viking constituted a time charter.

Our precedent on what constitutes a time charter under blackletter maritime law is relatively clear. Under a time charter, "the charterer engages for a fixed period of time a vessel, which remains manned and navigated by the vessel owner, to carry cargo wherever the charterer instructs." *Nissho–Iwai Co. v. M/T Stolt Lion*, 617 F.2d 907, 914 (2d Cir.1980). By contrast, "[t]he fundamental characteristic of a demise or bareboat charter is the shifting of the exclusive possession and control of the chartered vessel from the owner to the charterer during the charter period." *Blanco v. United States*, 775 F.2d 53, 57–58 (2d Cir. 1985) (internal quotation marks omitted); *see also Fitzgerald v. A.L. Burbank & Co.*, 451 F.2d 670, 676 (2d Cir. 1971) ("To create a demise the owner of the vessel must completely and exclusively relinquish possession, command, and navigation thereof to the demise. . . . [A]nything short of such a complete transfer is a time or voyage charter.") (internal quotations and citations omitted); *Am. Petroleum & Transp., Inc. v. City of New York*,

10

737 F.3d 185, 187 n.1 (2d Cir. 2013) ("In a demise or bareboat charter, the charterer is owner *pro hac vice* of the vessel, and the charterer is treated as the owner of the vessel with a sufficient property interest to recover lost profits. The demise charter is tantamount to, though just short of, an outright transfer of ownership." (internal quotation marks and citation omitted)). This court "start[s] with the general presumption that the owner does not mean to put his vessels into the possession of the charterer, and that the presence of his own crew on board is very strong presumptive evidence that he does not, which only very cogent circumstances will overthrow." *Hansen v. E.I. DuPont de Nemours & Co.*, 33 F.2d 94, 96 (2d Cir. 1929) (internal citations and quotations omitted).

MARAD's determination that River 1 and Viking's proposed agreement constituted a time charter under blackletter maritime law precedent was reasonable. The agreement between River 1 and Viking does not grant Viking exclusive possession and control of the cruise ship in any way that blackletter maritime law recognizes as sufficient to create a bareboat charter.

A number of other facts support MARAD's finding that the agreement is a time charter. Most importantly, River 1 is responsible for providing the crew for the ship, and River 1's "vessel master" will oversee the ship's operations. As noted

above, "the presence of [the ship owner's] crew on board is very strong presumptive evidence" that an agreement is a time charter. *Id.* (internal quotation marks and citation omitted).

It is true that the agreement allows Viking to request that the vessel master be replaced. However, Viking may only do so in the context of unsatisfactory performance, and Viking has no power to direct who that replacement should be. The vessel master is always "selected and paid by" River 1. *See In re: The Spokane*, 294 F. 242, 245–46 (2d Cir. 1923). Further, the agreement gives River 1's vessel master the power to decline any Viking request that she deems unreasonable or determines could create a safety risk.

Additionally, River 1 bears primary responsibility for the ship's day-to-day maintenance and care. "If the owner [of the vessel] is responsible for keeping the vessel in good condition during the life of the charter or if the owner supplies the master and crew, it is extremely unlikely that there has been a demise to the charterer," and "the mere fact that the charterer has some control over the master or that the charterer selects the routes to be taken or the cargo to be carried" does not establish a bareboat charter. *Fitzgerald*, 451 F.2d at 676 (citations omitted). While Viking is responsible for passenger-related expenses, River 1 is required to

12

"maintain the ship in a condition acceptable for use as a passenger cruise vessel," *see* Joint App'x at 90, an obligation that requires it to conduct all maintenance and repair, procure fuel for the ship, and provide insurance for the ship itself and the machinery onboard.

Finally, Viking's ability to set the itinerary is consistent with the maritime law definition of a time charter. In *Fitzgerald*, we affirmed that a typical time charter allows the charterer to "select[] the routes to be taken or the cargo to be carried." *Fitzgerald*, 451 F.2d at 676.

## 2. Analogous MARAD Regulations

MARAD's analysis of blackletter maritime law was sufficient on its own to reach the conclusion that the agreement between River 1 and Viking constituted a time charter, and thus find that the agreement did *not* constitute an impermissible transfer of control to a foreign corporation under 46 U.S.C. § 56101(a)(i). However, MARAD also looked to additional regulatory authority to further support its decision. We determine that MARAD's analysis of this additional authority was reasonable.

Although it has done so with respect to some other Jones Act provisions, MARAD has not promulgated regulations for evaluating whether a charter of a

13

*passenger* vessel to a non-citizen represents an impermissible transfer of control. Thus, for additional authority to support its decision in this matter, MARAD looked to 46 C.F.R. § 356.11, a similar set of regulations promulgated under the American Fisheries Act for evaluating charters and transfers of commercial fishing vessels. Because of the lack of regulations on point, we defer to MARAD's reasonable decision to look to 46 C.F.R. § 356.11 as additional persuasive authority.

American Cruise Lines not only claims that the agreement between Viking and River 1 violates the per se impermissible control factors outlined in 46 C.F.R. § 356.11(a), but also that taking all factors into account, there were sufficient indicia of impermissible control under § 356.11(b). We are not persuaded and conclude that MARAD's analysis of the per se impermissible control factors and indicia of impermissible foreign control factors under 46 C.F.R. § 356.11 reasonable and well-supported.

American Cruise Lines focuses on three aspects of the charter agreement that it says suggest impermissible foreign control under the regulation. More specifically, American Cruise Lines asserts that: (1) the agreement requires Viking to absorb certain standard operating costs and business risks, (2) Viking may direct that the vessel master be removed, and (3) the financing for the ship's construction

14

gave Viking impermissible equity in the ship itself. On the record before us, we cannot say MARAD erred notwithstanding these arguments.

Regarding the operating costs and business risks, 46 C.F.R. § 356.11 establishes that the foreign corporation involved in the transaction may not "absorb[] *all of the costs and normal business risks* associated with ownership and operation of" the vessel or take "responsibility for the procurement of insurance on the" vessel." 46 C.F.R. § 356.11(a)(8)–(9) (emphasis added). MARAD reasonably found that the liability and operating costs were distributed between the two parties in this agreement in a manner that did not vest Viking with an impermissible level of control. While the agreement does place certain indemnification obligations on Viking, such as liability for torts arising from passenger misconduct, the business risks associated with maritime activities remain with River 1, which is required to maintain the ship in good working order, procure insurance and fuel, and assume liability for navigation- and maritime-related issues.[3]

---

[3] American Cruise Lines additionally alleges that the agreement's "hell or high water" provision immunizes River 1 from the normal business risk of going "off-hire," a risk usually assumed by the vessel owner in a time charter. We give no weight to this argument. American Cruise Lines may be correct that the most common forms of time charters do not contain hell or high water provisions; however, MARAD and federal courts have authorized time charters containing such provisions in the past. *See, e.g.*, *Regent Seven Seas Cruises, Inc. v. Rolls Royce, PLC*, Nos. 06-22347-CIV, 06-22539-CIV, 2007 WL 601992 (S.D. Fla. Feb. 21, 2007); *Construcciones*

Regarding Viking's ability to have River 1's vessel master removed, the American Fisheries Act regulations suggest that an agreement may not "limit the actions of or replace the chief executive officer . . . of the entity which owns the" vessel. 46 C.F.R. § 356.11(a)(2). As discussed above, River 1 retains the "exclusive authority to appoint an independent, substitute vessel manager" in such a situation. Joint App'x at 387.

Finally, American Cruise Lines suggests that Viking used a pre-paid charter hire to advance the funds for the ship's construction and thus finance the ship in a manner that a separate American Fisheries Act regulation, 46 C.F.R. § 356.45, suggests was impermissible. In reaching its decision, MARAD did not rely on this regulation at all. Given the deference we afford to an agency for reasonable interpretations of its own regulations, we cannot say that MARAD's decision not to apply this particular fishing industry regulation to a matter involving a passenger cruise ship was impermissible.

### D. MARAD's Decision-Making Process

In addition to its substantive allegations, American Cruise Lines also alleges that MARAD failed to follow the notice and comment provisions applicable to this

_Industriales Del Golfo, S.A. de C.V. v. Searex, Inc._, No. 98-20898, 1999 WL 423004 (5th Cir. May 28, 1999).

case. We determine that these arguments are without merit and hold that MARAD properly complied with all procedural requirements in reaching its March 2022 final decision.

As discussed above, River 1 and Viking initially sought confirmation from MARAD that their agreement constituted a time charter pursuant to 46 C.F.R. § 221.13 on December 20, 2019. That initial request for confirmation went on an interesting and atypical journey through the administrative decision-making process because of an intervening change in federal legislation.

At the time River 1 and Viking initially sought confirmation, MARAD was under no statutory or regulatory obligation to provide a notice and comment period for confirmations under 46 C.F.R. § 221.13 (and typically did not publicize any documentation regarding these confirmations at all). This changed in 2021, when, as part of the National Defense Authorization Act of 2021 (the "2021 NDAA"), Congress established that "the Maritime Administrator shall make publicly available . . . a detailed summary of each request for a determination, approval, or confirmation that vessel charter for a passenger vessel is encompassed by the general approval of time charters" and "the final action of [MARAD] with respect to such request, after the provision of notice and an

17

opportunity for public comment." 2021 NDAA, Pub. L. No. 116-283, § 3502(b), 134 Stat. at 4398.

We conclude that MARAD fully complied with the new procedural requirements the 2021 NDAA imposed regarding this transaction. MARAD posted a summary of River 1's request on a public website on July 30, 2021, and opened a 60-day period for the public to submit comments. The summary included many key facts upon which MARAD eventually relied to conduct its analysis as to whether the agreement was a time charter, including that "River 1 would be responsible for hiring, provisioning, and paying the vessel's marine crew," "River 1 would be responsible for vessel maintenance and repair," "River 1 would be responsible for insuring the vessel," and "Viking would make an advance charter hire payment that would be used by River 1 to cover the delivered price of the vessel." Joint App'x at 260. And when MARAD eventually published its final decision, it specifically responded to arguments the public had submitted in a thoughtful and reasonable manner. *See* Spec. App'x at 1. We determine that this summary and MARAD's subsequent consideration of the comments they received were "detailed" enough to satisfy the new procedural requirements that the 2021 NDAA imposed on MARAD.

American Cruise Lines alleges that MARAD's July 2021 notice was too vague to provide for meaningful public comment. This argument reads too much into what Congress intended to require of MARAD. American Cruise Line's analogy to the National Environmental Protection Act ("NEPA") and our precedent in *Brodsky v. United States Nuclear Regulatory Commission*, 704 F.3d 114 (2d Cir. 2013), is incorrect. NEPA imposes a more proscriptive notice requirement than § 3502(b) of the NDAA does, requiring a "detailed statement" rather than a "detailed summary." And in *Brodsky*, the agency allowed for *no* public participation at all. MARAD allowed for public notice and comment in this case— American Cruise Lines' disagreement is only as to degree. Nothing in *Brodsky* sets a specific amount of public participation an agency must allow, and "judicial review of the procedure an agency fashions to discharge its statutory duties is generally deferential." *New York v. Fed. Energy Regul. Comm'n*, 783 F.3d 946, 955 (2d Cir. 2015). We see no legal error in MARAD's process under the 2021 NDAA.

## CONCLUSION

We do not suggest today that, as a matter of law, charter arrangements such as this one are per se legal under the Passenger Vessel Services Act of 1886, the Shipping Act of 1916, or other Jones Act provisions. We merely conclude

that, based on the record before it, MARAD did not act in an arbitrary and capricious manner in confirming that this particular arrangement constituted a valid time charter and was not an impermissible transfer of control of a vessel to a non-citizen. If American Cruise Lines or any other interested party feels that MARAD's review was not demanding enough, that is an issue they shall have to take up with Congress.

We have considered American Cruise Lines' remaining arguments and find them to be without merit. For the foregoing reasons, we **AFFIRM** the final decision of the United States Maritime Administration.