19-1140-cv
Power Auth. of the State of N.Y. v. M/V Ellen S. Bouchard

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2019
No. 19-1140-cv

POWER AUTHORITY OF THE STATE OF NEW YORK,
*Plaintiff-Appellant*,

*v.*

M/V ELLEN S. BOUCHARD, and the BARGE B NO. 280, their engines,
apparel, tackle, boats, appurtenances, etc., *in rem*, BOUCHARD
TRANSPORTATION CO., INC., MOTOR TUG ELLEN S. BOUCHARD, INC.,
B. NO. 280 CORP.,
*Defendants-Appellees*.[1]

Appeal from the United States District Court
for the Southern District of New York
No. 1:14-cv-04462 — Paul A. Crotty, *Judge*

ARGUED: APRIL 17, 2020
DECIDED: JULY 30, 2020

---

[1] The Clerk of Court is respectfully directed to amend the caption as set
forth above.

1

Before:  LIVINGSTON, LOHIER, and NARDINI, *Circuit Judges*.

———————

The plaintiff-appellant, the Power Authority of the State of New York ("the Authority"), appeals from an order and judgment of the United States District Court for the Southern District of New York (Crotty, *J.*), which granted summary judgment to the defendants-appellees, two vessels and their corporate owners, on the Authority's claims brought under the federal Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*, and transferred the Authority's remaining state-law claims to a related proceeding.  The Authority's claims arose from the release of thousands of gallons of oil from a submarine power-transmission cable into Long Island Sound.  The Authority alleges that the defendant vessels caused the release by dropping anchor. The district court entered summary judgment on the basis that the cable was not a "facility" as defined by the OPA because it was not "used for" one of the statutory definition's enumerated purposes, meaning the discharge was not governed by the OPA.  We disagree, finding that the cable system is used for at least one of the enumerated purposes, and that it was therefore error to conclude the system was not a "facility" on that basis.  For this reason, we **VACATE** the order of the district court and **REMAND** for further proceedings consistent with this opinion.

———————

VINCENT J. FOLEY (James H. Hohenstein, *on the brief*), Holland & Knight LLP, New York, NY, *for Plaintiff-Appellant*.

GINA M. VENEZIA (Wayne D. Meehan, John J. Walsh, *on the brief*), Freehill Hogan & Mahar, LLP New York, NY, *for Defendants-Appellees.*

Jeffrey Bossert Clark, Assistant Attorney General, Eric Grant, Deputy Assistant Attorney General, Ellen J. Durkee, Jennifer Scheller Neumann, Katherine W. Hazard, United States Department of Justice, Washington, DC, *for Amicus Curiae* United States of America, *in support of Plaintiff-Appellant.*

WILLIAM J. NARDINI, *Circuit Judge*:

This appeal arises from the discharge of several thousand gallons of oil into Long Island Sound from a "submarine cable" — that is, an underwater system that transmits electricity, and through which dielectric fluid is pumped as a lubricant and coolant. The plaintiff-appellant, the Power Authority of the State of New York ("the Authority"), alleges that the dropped anchor of the Barge B. No. 280, which was being towed by the tugboat M/V *Ellen S. Bouchard*, ruptured the cable, which the Authority owns and operates. Following the containment and remediation of the oil discharge, the Authority sought compensation for its expenditures by suing the defendants-appellees: the two vessels and their corporate owners

(collectively, "Bouchard"). The Authority brought claims pursuant to the federal Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*, and the New York Oil Spill Law ("NYOSL"), N.Y. Nav. Law § 170 *et seq.* The corporate defendants-appellees, meanwhile, initiated parallel proceedings pursuant to the Limitation of Liability Act ("Limitation Act"), 46 U.S.C. §§ 30505, 30511.

The Authority now appeals from an order and judgment of the United States District Court for the Southern District of New York (Crotty, *J.*), which determined that the OPA's statutory definition of a "facility," 33 U.S.C. § 2702(9), did not encompass the submarine cable because it was not "used for" any of the "purposes" enumerated in the definition. As a result, the Authority did not have a viable claim under the OPA to recover its costs related to the discharge. The district court entered partial summary judgment in favor of Bouchard on the OPA claims, denied the Authority's cross-motion for summary

4

judgment, and transferred the Authority's remaining state-law claims to the parallel Limitation Act proceeding.

We hold that the submarine cable is indeed "used for" one of the enumerated "purposes" in the statute's definition of "facility."  It was therefore error for the district court to dismiss the Authority's OPA claims and to conclude that the Authority's NYOSL claims had to be brought in the parallel proceeding on that basis.  Accordingly, we vacate the order of the district court and remand for further proceedings consistent with this opinion.

I.    **Background**[2]

**A. The Submarine Cables**

The Authority owns and operates the Y-49 Cable System, a power transmission cable system that spans Long Island Sound.  The cable system runs from the Sprain Brook Substation in Westchester

---

[2] Except as otherwise noted, these facts are not in dispute.

County, which Consolidated Edison ("Con Edison") operates, to the East Garden City Substation in Nassau County, which the Long Island Power Authority operates.

There are four submarine cables spanning Long Island Sound, with two self-contained fluid-filled ("SCFF") pressurization plants located at the two ends of the cables. The four submarine cables are high-voltage transmission cables consisting of multiple layers, including the electrical conductor and a layer of "fluid-impregnated paper insulation." Joint App'x 479. Additionally, a central duct in each cable is filled with dielectric fluid, which is a "hydrocarbon, petroleum-based oil" that "acts as a coolant and lubricant to the electrical components of the submerged cables." *Id.* at 603–04. The four cables combined hold approximately 10,000 gallons of the dielectric fluid at any given time.

The SCFF pressurization plants, meanwhile, are comprised of storage tanks holding reserve dielectric fluid, as well as equipment to

6

monitor and regulate the pressure in the submarine cables. The plants are required to keep a constant static pressure in the cables to ensure the cables function properly. To do that, the plants increase or decrease the volume of dielectric fluid stored in the cables. Because the maintenance of constant pressure requires differing amounts of fluid depending on, among other things, the temperature of the water surrounding the cables, the dielectric fluid regularly flows through the plants and cables.

### B. The Discharge

On January 6, 2014, the defendant Barge B. No. 280, in the course of being towed by the M/V *Ellen S. Bouchard* through Long Island Sound, dropped anchor. Shortly thereafter, Submarine Cable No. 3 experienced an electrical fault; at the same time, the system's monitors reported a sudden pressure drop in the cable, which indicated a leak of dielectric fluid was underway. The Authority alerted local and federal authorities, while also working with Con

Edison and the Long Island Power Authority to initiate a response. Over the next several weeks, these entities, along with the Authority's environmental response contractor, Miller Environmental Group, took efforts to contain and then clean up the spill, in consultation with the U.S. Coast Guard and New York officials. Among the required containment steps was the continued pumping of dielectric fluid into Cable No. 3, to maintain pressure and prevent water from entering the cable and potentially destroying it. Because of this ongoing need to pump fluid into the cable, the total discharge from Cable No. 3 was well above the cable's capacity of 2500 gallons. On February 27, 2014, the cable was finally capped and set back on to the sea floor. The Authority claims that it paid $9,848,087.12 for the costs of the remediation.

### C. Statutory Framework

Congress enacted the OPA in 1990 in the aftermath of the Exxon *Valdez* disaster, with an aim to unify and supplement the then-existing

patchwork of federal regulations governing oil pollution. *See* Pub. L. No. 101-380, 104 Stat. 484 (codified at 33 U.S.C. § 2701 *et seq.*); *see also* S. Rep. No. 101-94, at 2–3 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 723–24 (discussing the need for comprehensive federal legislation in light of the "unreasonably slow, confused, and inadequate response by industry and government that failed miserably in containing the [*Valdez*] spill and preventing damage"). Among its provisions, the OPA establishes a framework of liability and compensation for the costs of remediating oil spills. 33 U.S.C. §§ 2702–2712. Under this framework, "each responsible party for a vessel or a facility from which oil is discharged . . . into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages . . . that result from such incident." *Id.* § 2702. The responsible party is defined by reference to the source of the oil discharge in question (*e.g.*, a vessel, an onshore facility, or an offshore facility). *See id.* § 2701(32). However, the OPA also provides

a mechanism for shifting liability to third parties: If the responsible party can establish that the discharge and resulting liability "were caused solely by an act or omission of one or more third parties," then those parties become the responsible parties for purposes of OPA liability. *Id.* § 2702(d)(1)(A).

Of central importance to this appeal, the OPA defines a "facility" as follows:

> [A]ny structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil. This term includes any motor vehicle, rolling stock, or pipeline used for one or more of these purposes.

*Id.* § 2701(9). The OPA also provides separate definitions for an "offshore facility" and an "onshore facility." *See id.* § 2701(22), (24).[3]

---

[3] An offshore facility is "any facility of any kind located in, on, or under any of the navigable waters of the United States, and any facility of any kind which is subject to the jurisdiction of the United States and is located in, on, or under any other waters, other than a vessel or a public vessel." 33 U.S.C. § 2701(22). An

Finally, the OPA contains a savings clause, which governs the effect of the statutory scheme on state law. *See id.* § 2718. The clause states:

> Nothing in this Act or the Act of March 3, 1851 [the Limitation Act] shall . . . affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to . . . (A) the discharge of oil or other pollution by oil within such State; or (B) any removal activities in connection with such a discharge.

*Id.* § 2718(a).

The Limitation Act effectively caps the liability of vessel owners for claims for certain damages caused by their vessels, limiting recovery to the value of the vessel in question and its freight. *See* 46

---

onshore facility is "any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land within the United States other than submerged land." *Id.* § 2701(24).

U.S.C. § 30505. [4]  To enforce this cap, vessel owners may launch proceedings under the Limitation Act, in which all prospective claimants must bring their claims.  Once such proceedings are initiated, the Limitation Act provides that any other proceedings to recover from the vessel owner "related to the matter in question shall cease."  *Id.* § 30511.

## II.    Procedural History

Shortly after the rupture, on February 26, 2014, the corporate defendants in this case[5] started a Limitation Act proceeding in the United States District Court for the Southern District of New York.

---

[4] Specifically, § 30505(a) states in relevant part that "the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight."  And § 30505(b) states that, barring exclusion by another provision of law, those claims subject to limitation "are those arising from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner."

[5] That is, Bouchard Transportation Company, Inc., Motor Tug Ellen S. Bouchard, Inc., and B No. 280 Corporation.

*See In re Bouchard Transp. Co.*, No. 14-cv-01262-PAC.  The Authority

and its insurers filed claims in the Limitation Act proceeding in April

2014 but expressly reserved the right (and expressed the intent) to

separately bring claims against Bouchard under the OPA and the

NYOSL.  In June 2014, the Authority did just that, bringing this action

against Bouchard.

After discovery, the parties filed cross-motions for summary

judgment.  Bouchard sought summary judgment on the Authority's

OPA claims, as well as dismissal without prejudice of the remaining

state-law claims with an order directing the Authority to pursue those

claims in the Limitation Act proceeding.

On March 27, 2019, the district court granted Bouchard's

motion for summary judgment and denied the Authority's cross-

motion.  *See Power Auth. of N.Y. v. Tug M/V Ellen S. Bouchard*, 377 F.

Supp. 3d 230, 239 (S.D.N.Y. 2019).  Acknowledging that there was

"virtually no applicable case law elaborating" on the scope of the

OPA's "facility" definition, the district court concluded that the submarine cables did not come within that definition. *Id.* at 236. In so concluding, the district court first determined that its analysis was limited to the submarine cables themselves, excluding the pressurization plants. *Id.* The district court determined that the cables were not "used for" any of the enumerated purposes in the definition, meaning that they were not a "facility." It thus held that the discharge did not come within the OPA's scope. Lastly, because the Authority did not have a valid OPA claim, the district court concluded that the OPA's savings clause did not preempt the Limitation Act, so that the Authority could pursue its NYOSL claim only in the parallel proceeding.

III. **Discussion**

The Authority appeals from the district court's order and judgment, challenging its conclusion that the submarine cables were not a "facility" within the meaning of the OPA because the cables

14

were not "used for" one of the purposes that the OPA enumerates. In the alternative, the Authority challenges the district court's determination that the OPA's savings clause did not allow the remaining state-law claims to be brought outside of the Limitation Act proceeding.

As explained below, we agree with the Authority that the submarine cables are "used for" at least one purpose enumerated in the OPA's definition of "facility." We therefore hold that the district court erred in granting Bouchard summary judgment on the OPA claims and transferring the state-law claims to the Limitation Act proceeding on that basis.

## A. Standard of Review

We review a grant of summary judgment *de novo*; specifically, where the "disposition presents only a legal issue of statutory interpretation," as here, "we review *de novo* whether the district court correctly interpreted the statute." *Hayward v. IBI Armored Servs., Inc.*,

15

954 F.3d 573, 575 (2d Cir. 2020) (quoting *City of Syracuse v. Onondaga Cty.*, 464 F.3d 297, 310 (2d Cir. 2006)).

**B. Analysis**

The district court's decision was premised on the determination that the submarine cable was not a "facility" within the meaning of the OPA. We disagree. Even assuming *arguendo* that the relevant unit of inquiry here is limited to the cables themselves and does not include the pressurization plants, as the district court held, we conclude that the cables are "used for" an enumerated purpose within the OPA's "facility" definition.

In interpreting a statutory provision, our analysis begins with "the plain meaning of [the] law's text, and, absent ambiguity, will generally end there." *United States v. Balde*, 943 F.3d 73, 81 (2d Cir. 2019) (internal quotation marks omitted); *see also Artis v. District of Columbia*, 138 S. Ct. 594, 603 (2018) ("In determining the meaning of a statutory provision, we look first to its language, giving the words

used their ordinary meaning." (internal quotation marks omitted)). Only if the text is ambiguous do we "turn to canons of statutory construction for assistance in interpreting the statute." *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 111 (2d Cir. 2015).

Here, we find that the plain meaning of the OPA's definition of "facility" encompasses at least one of the purposes for which the submarine transmission cables are used. To recall, the OPA defines a "facility" as follows:

> [A]ny structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil. This term includes any motor vehicle, rolling stock, or pipeline used for one or more of these purposes.

33 U.S.C. § 2701(9). The cables clearly fit within the first portion of the definition, in that they are a structure or equipment. Neither party disputes that. Moreover, the record shows that the cables have the capability of, at least, "transferring" the dielectric fluid, which for purposes of this appeal we assume to be an oil within the meaning of

17

the OPA.[6] *See Transfer*, *Webster's Ninth New Collegiate Dictionary* (1990) (defining "transfer" as, among other things, "to convey from one person, place, or situation to another"); *Transfer*, *American Heritage Dictionary* (2d ed. 1990) (in relevant part, defining "transfer" as "to convey or shift from one person or place to another").

The crux of the question, then, is whether the utilization of this capability suffices for the cables to be considered "used for" that "purpose[]." 33 U.S.C. § 2701(9). We hold that it does. The definition's language requires nothing more than that the cables be employed to transfer the dielectric fluid. And it is clear from the undisputed facts in the record that the cables are regularly used to, among other purposes, convey dielectric fluid along the length of the

---

[6] The OPA defines "oil" broadly, stating in relevant part that an oil covered by the statute includes "oil of any kind or in any form, including petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil." 33 U.S.C. § 2701(23). For purposes of its summary judgment motion below, Bouchard assumed without conceding that the dielectric fluid was an "oil" within the OPA's definition, and the district court made a similar assumption without deciding the issue. We likewise need not answer that question in the first instance to adjudicate this appeal, but it is an issue that will need to be resolved on remand.

cables and between the cables and the pressurization plants, as the system calibrates and adjusts the volume of fluid required to maintain proper pressure in light of external conditions. Indeed, the record establishes that this movement of dielectric fluid — that is, its transfer in and out of the cables — is vitally important for the system to function properly.[7]

Bouchard urges — and the district court adopted — a more restrictive reading of this language, but Bouchard's proffered limitations would narrow the scope of the OPA beyond what the words of the statute support. First, Bouchard's assertion that the cables are "primarily" or "substantially" used for power transmission, and only incidentally for one of the statutorily enumerated purposes, is beside the point. The definition contains no

---

[7] Because our conclusion that the cables were used for the purpose of transferring the dielectric fluid is sufficient to determine that the district court erred in concluding they were not a "facility" within the meaning of the OPA on that basis, we need not address whether they were also used for additional qualifying purposes, such as storing or handling the fluid.

19

primacy requirement.  To the contrary, the law expressly provides that equipment may serve multiple purposes and still count as a "facility": a facility may be "used for one *or more of*" the enumerated purposes.  *Id.* § 2701(9) (emphasis added).  Further, Congress is fully capable of drafting statutes requiring that a given use be primary or substantial.[8]  Its choice to not do so here undermines Bouchard's argument that we should construe the OPA more narrowly than its text would suggest.

Similarly, we are not persuaded by Bouchard's argument that the OPA is "aimed at facilities that are engaged in oil exploration, production and transportation[,] as opposed to facilities that merely

---

[8] The U.S. Code features a number of instances of the phrases "used primarily for," "primarily used for," or "used substantially for," including in Title 33 itself.  *See* 33 U.S.C. § 1362(25) (defining recreational vessels in part as those "used primarily for pleasure"); *see also, e.g.*, 40 U.S.C. § 8902 (for purposes of statute on monuments, defining "commemorative works" as excluding those "located within the interior of a structure or a structure which is primarily used for other purposes" beyond those enumerated); 47 U.S.C. § 395(b)(4) (requiring that "facilities and equipment" to be purchased using certain grants be "used substantially for" enumerated activities).

use oil incidental to other industrial uses." Appellant's Br. at 16. Even if the Exxon *Valdez* oil spill prompted Congress to enact the OPA, and that many incidents triggering the OPA will relate to commercial oil exploration, production, and transportation, Congress did not write such a limitation into its definition of "facility." To the contrary, other portions of the OPA demonstrate that the term "facility" is more encompassing than that. For example, the definition of "oil" coming within the OPA's scope is indisputably broad, with the statute referencing animal- and vegetable-based oils in addition to petroleum. *See* 33 U.S.C. § 2701(23) (defining oil as "oil of any kind or any form," and restricting that definition only by excluding substances deemed "hazardous" pursuant to a separate statutory authority); *see also id.* § 2720(a) (requiring that any promulgated oil-related regulations differentiate between varying types of oils, including vegetable- and animal-based oils as well as petroleum). Moreover, the OPA elsewhere *does* limit its reach to the oil exploration

or production industries, limiting its definition of "foreign offshore unit" in just such a manner. *See id.* § 2701(10) (defining "foreign offshore unit" as "a facility which is located, in whole or in part, in the territorial sea or on the continental shelf of a foreign country and which is or was used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting *oil produced from the seabed beneath the foreign country's territorial sea or from the foreign country's continental shelf*" (emphasis added)). In sum, the plain language of the OPA's "facility" definition includes at least one of the purposes for which the cables here are used, and statutory context confirms that reading.[9]

---

[9] We are similarly unpersuaded by Bouchard's argument that its narrower reading of the OPA is supported by how the Clean Water Act ("CWA") and the OPA respectively define "facility." The CWA, like the OPA, includes separate definitions for "onshore facility" and "offshore facility," *see* 33 U.S.C. § 1321(a)(10), (11); however, only the OPA contains a standalone definition of "facility" as well. Though the district court rightly noted that this "added language means something," *Bouchard*, 377 F. Supp. 3d at 238, we disagree that the language narrows the OPA's definition in such a way as to exclude the cables. Instead, the language merely limits what purposes the relevant structure or equipment must

22

Because we hold that these cables are used for at least one of the purposes specified in the OPA's definition of "facility," the district court's conclusion that the Authority did not have a viable OPA claim was error. [10]    Further, the district court's decision to transfer the Authority's NYOSL claims to the Limitation Act proceeding, predicated as it was on the finding that the Authority did not have a viable OPA claim, was error as well.[11]

---

be used for in order to comprise a facility under the OPA.  Nothing in the language, even when contrasted with the CWA, suggests a conclusion that to be a facility, a given object must be used primarily for one of the enumerated purposes or be associated with the oil exploration or production industries in some way.

[10] As noted above, we do not reach the question of whether the dielectric fluid is an "oil" for purposes of the OPA, as would be required to definitively conclude the cables are a "facility."  That is a question for the district court to answer, in the first instance.

[11] Because we conclude that the district court erred in evaluating the Authority's OPA claim, we need not reach the question of whether the OPA's savings clause would have preempted the Limitation Act for purposes of the Authority's NYOSL claim if the Authority did not have a viable OPA claim.

**IV. Conclusion**

To summarize, we hold as follows:

The submarine cables here are used at least for the purpose of transferring dielectric fluid within the meaning of the OPA's definition of "facility" because they are used to transfer dielectric fluid along the length of the cables and between the cables and the pressurization plants. As a result, the district court erred in concluding that the cables were not a "facility" on the basis that they were not used for any such purpose, and that the Authority thus did not have a viable claim under the OPA.

We accordingly **VACATE** the order and judgment of the district court and **REMAND** for further proceedings consistent with this opinion.